Thank you, Your Honor. Nathaniel Garrett for SimpliSafe. I intend to reserve three minutes for rebuttal, and I'll watch my clock. May it please the Court, this case really turns on two key questions, and the District Court got them both wrong. The first question is whether SimpliSafe formed a binding contract with plaintiffs at checkout. They did. On an uncluttered payment page, SimpliSafe twice told plaintiffs, in dark 12-point font against a clear white background, that by submitting their order they were agreeing to SimpliSafe's terms of sale and terms of service. Both of these notices were immediately adjacent to the place order button, with the hyperlinks the only underlined words on the page. That's a reasonably conspicuous notice. The second question is whether the parties clearly and unmistakably delegated arbitrability to the arbitrator by incorporating the AAA rules. And again, they did. In Brennan, this Court held that incorporation of the AAA rules is clear and unmistakable evidence of delegation. Keebaugh then applied that principle to mobile phone gamers, including minors. And every circuit to consider plaintiffs' unsophisticated parties exception has rejected it. Do we have to reach the sophistication point? No, you don't, Your Honor. If the Court agrees with us that the parties agreed to the terms of sale and the terms of service at checkout, then I think it's a pretty easy question whether their claims fall within the scope of those terms. But if – but really – so I think there's an alternative ground there. But it's really – our point is it's not for the Court to decide if we did agree on delegation. So I think in a sense the Court does have to answer that. So I guess Brennan has some language that talks about this. But under California law, sophistication is an element of unconscionability.  OK. Was there an unconscionability claim before the district court? It was, Your Honor. OK. In reading the district court's decision, the sophistication kind of comes in at the end. So it's not clear. I mean what do you take – how should we read where in the analytical flow chart the district court was bringing sophistication in? So I don't think it came in on unconscionability because the court just said flat out because there was an opt-out clause, there was an unconscionability. And that would be error. In fact, it said that it wasn't reaching the unconscionability. If it placed sophistication outside of an unconscionability analysis without any of the balancing or anything, it couldn't do that work, could it? I'm not sure I understand the question. I mean certainly the court did address the sophistication outside of unconscionability. I don't think there's any question about that. But their sophistication doesn't exist as a defense to formation of a contract. That's exactly our point, Your Honor. OK. That's exactly our point. And doesn't the district court also say that it is not otherwise engaging in the unconscionability? Well, it says I'm just – I'm not finding unconscionability because of the opt-out, and they haven't challenged that. So there's no question. But maybe where the sort of dialogue here where I'm getting confused is that I think this is sort of an unconscionability argument dressed up as a contract formation argument. I mean I think it was the same – But sophistication can never do that work alone under California law. Absolutely, Your Honor. OK. Absolutely because – and I think they concede that. I mean under California law, it doesn't even matter if you don't speak English. That's not a defense to contract formation. So if that's so, then I think they have to admit that sophistication can't be a defense, and that's why they turn to say, well, it's not really a California issue. It's a federal law issue of what clear and unmistakable means. That's what they're saying. That has to carry the weight. The fact that there is this federally – maybe not common law, but it's a federal standard. As Brendan said, this is federal law, the clear and unmistakable standard announced by the Supreme Court. And so they're putting all their eggs in that basket saying, well, because it's clear and unmistakable, you have to look at the sophistication of the parties. And I don't think it can carry that weight. But under Rent-A-Center, the clear and unmistakable is in a different column than ordinary defenses at law. Precisely, Your Honor. That's footnote one. On the formation, doesn't California law, though, also say that it seems to set a standard, and our job here is not to say what our law means. Our job is to discern what California law is, that it needs to be in a different color and underlined to have a hyperlink to an agreement? I don't think that can be the case, Your Honor. Well, I agree that it is a question of California law, but I don't think it can be the case that there's a rigid rule about that it has to be in blue, for example. And I don't even need to rely on Godun's principle that we don't adopt, per se, rigid rules. I can just point to cases where that wasn't the case, and still the notices were found to be reasonably conspicuous. California cases? So what are your best cases? Well, my best cases would be Patrick and Keebaugh, where the notices were neither blue, underlined, nor capitalized. Those are both our cases. I agree. I agree. Where can we land this in California's law? I don't think California law, frankly, is as developed in this area as federal law because of CAFA. I think you have, obviously, the Sellers case, which sort of sets forth the standard. But I also can't point – Sellers sets forth exactly the standard I described. Well, Sellers, I think, is a point in that it's talking about applying a different standard under the automatic renewal law rather than the standard this court has applied. So I think it would be inconsistent with this court's precedent to say you need it to be blue because this court has said that's not the case. Is this on page 89 of the excerpt? No, Your Honor. It's page 231, 2ER231. And the notices – there's two notices, both on the right hand – top right-hand side and the bottom left next to the placeholder button. And, again, I think what cases like Patrick, Keebaugh, and even the recent unpublished decision in Massell show is it's not enough to do what the district court did and say, well, I'm picking out one design feature. It's underlined rather than blue, and that's a fatal flaw. You have to look at all the different features of the page. And here it's not just that it's underlined. It's that we gave the notice twice. It's that it's immediately adjacent to the button. This is – if I think I could sort of summarize the cases that have refused to find notices reasonably conspicuous, there's some element of bearing the notice, whether that's barely legible font or separating the notice from the placeholder button. I think those are the kind of concerns the court has raised, that a reasonably prudent internet user just isn't going to see it. And that's to test. It's just whether they see it. And in this case, 231, it's right next to the action button. It's in the same font as other words on the page. So you know this isn't a case like Berman where the court said it was barely legible. So the point of sale question only goes to whether both plaintiffs are still in it. You have the backup service agreement. Right. So we have the backup. I guess Mr. Schluter-Beckner at least of what that agreement would be under the terms of service than if there were an agreement under the – I'm sorry, under the service agreement than if there were an agreement under the terms. So if you agree with us that both plaintiffs agreed – contracted a checkout, then they would have agreed to two terms, the terms of service. I'm asking the reverse. If I disagree with you that they agreed at checkout only one of the plaintiffs, then I think you have a better case under California law as to the service agreement piece. If we have just that for that plaintiff, any other difference in terms of the analysis as to that plaintiff? Well, not as to that plaintiff. Then the question would be who decides arbitrability in the scope of the claims. And so you go to the – was the district court right to have this unsophisticated parties exception? I guess I have another question about the district court's decision. So the district court said that the automatic renewal claim would go to arbitration? Correct. What is that? Was there an automatic renewal claim? Is there a private right of action? It's a very weird claim, Your Honor, because the automatic renewal law doesn't apply to us on the face of the statute. Did they bring an automatic renewal claim? They brought a UCL claim, an unfair competition claim, where the theory was it was unlawful because we violated the automatic renewal law, which doesn't apply to us. So what was the effect? And let me know if anything has happened since in arbitration. What was the effect of referring a claim that the plaintiffs did not bring to arbitration? Sorry, they did bring – they brought unfair competition law claims under two theories. One was the theory that there was a violation of the automatic renewal law, and one was a theory based on advertising. But does the rationale for not referring or for referring the automatic renewal law theory apply to the rationale for applying an unfair competition claim? Because the other UCL claims stayed out. Correct. Is that – I just don't – I'm trying to understand what difference a theory – what it means to send a theory to arbitration. I don't think there is a meaningful difference. So that could have been an error. Yes, and we argue that. We argue that whether they agreed to the terms of sale, the terms of service, both, that these claims are within the scope of the terms of service, whether or not that question should be answered by the arbitrator, even if the court answers that question. We argued that these were covered by the scope of the terms, and plaintiffs didn't argue otherwise. They didn't actually argue that they were outside the scope of the terms. That was something the district court did sua sponte. I want to go back to the notice because you relied on the Patrick and Keebaugh cases. In the Patrick case, you know, they said the notice is clear and legible, and the hyperlink phrase, terms of use, is colored bright green, contrasted against the surrounding white background and the adjacent black text. Moreover, the terms of use hyperlink is the same color as the other clickable links on the page, clearly selecting – suggesting clearly that it is a hyperlink. Here it's just tiny gray font that kind of recedes into the background. It's not even the same font size as the place order thing, whereas in the – and in Keebaugh, the Games of Thrones one, the language goes prominently across the whole length of it. It's hard to miss it, and it's the same font as, you know, the language underneath, which has the, you know, the hyperlink. So you're definitely not as prominent as either of these cases. A couple of things, Your Honor. Number one, we gave the warning twice. I think that helps. Number two, I would – But you could easily have – we wouldn't be here. If you had just used larger language on this, make it a little more prevalent. Your Honor, I could say the same thing about every single case that this court has found. The notice was reasonably conspicuous. I could come up with ways to make it better, but the question is just – But the reason why we have this doctrine is because we see these little tiny things that are going to escape the notice of the person clicking through. But that's where I have to disagree. It's not tiny. We put forth a declaration explaining this is in 12-point font. The same font is other words they have to read on the page. What they are – It's definitely a smaller font than place order. I agree, Your Honor, but they had to read their name, the credit card number and other things. So they can't say they couldn't read it. I mean what their argument boils down to is there's something like 90 – The font by submitting this order appears to me to be clearly smaller than any new credit cards will be automatically saved. Enter your credit card details. That is in 14-point font. But card number, credit card name, CVV address, that's all in 12-point font. And what their argument boils down to is there's something like 90 words on this page, and their argument is that the only words they didn't see are the one-third, the over 30 words that gave the notice right next to where they had to click the button. I think a reasonably prudent internet user would have at least seen that notice. OK. We've taken you over, Your Honor.  Your time. I'll give you the three minutes for rebuttal. All right. So we'll hear now from Mr. Dannis or Dannis?  Dannis. I was wrong altogether. All right. You may proceed. Thank you, Your Honor. Glenn Dannis for plaintiffs Schluter, Beckner and Bobka. So Judge Breyer's careful analysis here should be affirmed on three grounds. Number one, that no contract formed for either plaintiff, excuse me, when purchasing hardware. Number two, that no contract formed for Bobka when activating the free trial month of monitoring. And number three, that the false ad claims for Judge Schluter, Beckner fell outside the scope of the terms of service. For the first point regarding whether there was any sort of agreement at the hardware purchase, the context of the transaction demonstrates quite clearly that this is something where there was nothing that would have put someone on notice to an ongoing relationship. This was a one-time purchase of a standalone system. There was no account creation. There was no registration at the point of sale. And there was no enrollment of anything in terms of monitoring at the point of sale. There was also plenty of language in the actual checkout page that said, no contracts cancel at any time. This is exactly the sort of language that this court in Chabola said goes to a context that is not forward-looking. Regarding the visual design of the page, this goes to the, I'm sorry, is analyzed under the totality of the circumstances analysis. Only the bottom button is considered, and that's because the natural flow of the website draws the eye down, because that's the way that these were constructed. All three pages show that the eye moves down to the action buttons. To your Honor's point, to Judge Collins' point about the size of the font. But it is right next to the button, so they didn't bury it at a different part of the page. It is right next to it. It is a small font, but when you see place order, there's something right next to it. Well, there is some white real estate in between the two, and, in fact, there was some conflict in the briefing about which page to look at. If one looked at this on a. Do you agree that 231 is the relevant page? 231 is the page demonstrating the screenshot that the opposing side relies on. In our brief on page 12 of our brief, there's a slightly different one where there's a bit more white real estate that was taken from a laptop. What page, what ER page is that? I don't have it on me at the moment, Your Honor, but it is page 12 of our brief, and it is, of course, in the record. And, again, under either of them and under this court's analysis in Godin, even in Godin we were talking about a terms of service and a hyperlink that was above or below, and the court said there if it's not directly above or directly below, these small differences make all the difference in cases like this where we're always analyzing very small differences. This is quite a bit less conspicuous than that given that it's right off to the left and the eye is moving towards action items and, again, towards the action buttons that are bright blue with larger font. In addition to that, again, this circuit's decisions are rife with decisions decrying small gray font on a white background, which is what we have here. This is the Berman case, and we also cited StubHub. I think I'm looking at page 12 of your brief, and I think it matches what I originally held up with opposing counsel, which is ER 89. Yes, that's right, Your Honor. And he said that wasn't correct and that it was 231, but your position is that this is the correct one. Yes. Yes, Your Honor. And so this one does have a bit more space in this screen. And it's notable that the district court actually used the more favorable one for the other side and still found that it was a little bit. The district court was assuming 231 was what was seen. That's correct, Your Honor. Again, the location being off to the far left and outside the flow, again, all of this is about where is the eye being moved. And, again, just as Your Honor said earlier, this is all within their control. This is a page that they design, and when it's designed in such a way to draw the eye to the action buttons and in a certain flow, putting something to the left on the left side off to the side under Godin, that is not going to be enough. I think it's also worth saying that. I guess going to the service contract, if we agree with you on the point of sale, why is the service contract not enough? I mean, we've got I guess I'm looking at ER 342. You've got a contrasting color. It's the same font as everything else there. Well, absolutely, Your Honor. The problems with the one, the free month monitoring agreement, these are different problems, and I think more serious ones even than the checkout page. I mean, the most serious problem is there's a direct mismatch between what is asked of the user in order to create a contract and the button next to it, and this is directly in violation of CHEBOLA. In CHEBOLA, the notice said sign up, and the button said continue, and this court said that that mismatch was fatal on the second stage of the analysis, where it has to do with there has to be a complete and literal connection between what is being asked of the user and the button. Here we had by submitting this number and the button said next, it should have said submit. By saying next under this court's precedent, that is not sufficient. It has to be literal, and context, as this court said in Godin, is not relevant at stage two. What about 338? I mean, there's a lot of pages here to sort through, but so 338, terms of service, please read, and then agree to terms is the button. So this is the page where it says put in your name? Yeah, you put your name in, and then you click agree to terms. We concede, and this was a page that only Schluter-Beckner saw. We concede for Schluter-Beckner that that was sufficient, and that's only for the terms of service, not terms of sale. Okay. So why then is – does Brennan not control the incorporation of the delegation as clear and unmistakable? So for the – for Schluter-Beckner and for the delegation situation, I mean Brennan was a case where, as my friend on the other side pointed out in their briefing, this was a former, I believe, Jones Day partner who is ultra-sophisticated who now is in the C-suite of a bank whose presumably his career was about drafting and understanding how to parse difficult contracts. The court did leave open whether or not there would be a possibility of this being different for unsophisticated parties. This is where the sophistication point comes in. Do you agree that sophistication under California law is an element of unconscionability, procedural unconscionability? Yes, Your Honor. That's just one of many doctrines where the sophistication of the plaintiff is something that's considered.  Procedural unconscionability and then would have to be accompanied by some substantive unconscionability? Well, that's true, but on appeal, we're not taking issue with the unconscionability analysis. But then you're – but that doesn't – why doesn't that sink your sophistication piece of sophistication history? It's an entirely different analysis. So I believe I do agree with my friend on the other side that the law on the delegation issue is a federal one and it has to do with clear and unmistakable. Clear and unmistakable is a federal common law standard that was developed in first options, and it has solely to do with the expectations of – So the question whether or not the contract delegates an issue to the arbitrator is not an issue of California law but is an issue of federal common law? So what my understanding of it is and what we've argued in the brief is that the clear and unmistakable standard is a heuristic that's used for determining whether arbitrability specifically has been delegated. So when we're talking about delegation clauses and we're talking about delegating arbitrability, for this special kind of delegation, the courts have developed the clear and unmistakable. So the case establishes that that is governed by federal common law and not by California law? I believe that would be first options, and Rent-A-Center and Footnote 1 talk about the fact that the clear and unmistakable standard is based on the expectations of the parties. Do you have any – I think that's exactly right, but Rent-A-Center then sets aside the question of there's still state law defenses to formation, which is where sophistication will live. So do you have a case that connects the sophistication to – I mean I think in Brennan it's just kind of an aside. It came up at oral argument. They don't purport to place it within the clear and unmistakable. So where are we getting the idea that there's a sophistication defense to clear and unmistakable? I think that's a fair question, Your Honor. It's been developed, and it's been – there are a dozen different district court cases in California that have talked about sophistication in the context of these sort of incorporation by reference arbitrability decisions or the arbitrability delegation decisions. And what authority are they citing to come to that? This comes back to first options. But first options doesn't mention sophistication as a defense to clear and unmistakable. In fact, clear and unmistakable would mean that it's – that no one would make a mistake as to it regardless of sophistication. I think that's possible, Your Honor. I mean I would say that first options was the last case to – or I'm sorry, the initial case to have decided this issue. And that's the one that talked about the expectations of the – sort of the reasonable person or the regular user. And that's something where they talked about the fact that the normal thumb on the scale in favor of arbitration is reversed, and they would not expect to have arbitrability be something that's delegated. So you're asking us here to adopt for the first time – I'm not sure. You've cited to the district courts of the circuit. For the first time as a circuit, a federal common law doctrine of standalone sophistication that would defeat the Supreme Court's guidance on clear and unmistakable. It would not defeat the Supreme Court's guidance on clear and unmistakable. I take it that you think it's consistent, but we'd be the first ones to do that. You would be the first ones, Your Honor. We talked in the briefing about the fact that there were – there have been several other circuits, only two of which I believe were published decisions that have rejected a sophisticated sort of gloss or read on it. But it's not even necessary, I don't think, that you say – Isn't the question of whether it's clear and unmistakable just a question of reading the text? And here if you read the text, all right, it may – Judge Breyer may have thought you shouldn't have to go from one document to another document to another. But if you do that and you follow the objective meanings of the words, it's clear and unmistakable that this is delegated. I mean, Your Honor, I would say that it's actually not for even an additional reason. In the Henry Schein case before the United States Supreme Court in 2019, briefing talked about the fact that even the AAA rule doesn't give exclusive authority to the arbitrator to make that decision on his or her own jurisdiction. It says that that person may. This would be something where, sure, if a claim were filed in arbitration, they have that power, but a court also has that power. In other words, that's not clear and unmistakable either. I've pulled up footnote one to Rent-A-Center, and it seems to cut against your point. It says actually that to raise the unconscionability issue mistakes the subject of the clear and unmistakable requirement. That requirement pertains to the manifestation of intent, not to its validity. Validity is handled by – is governed by Section 2's provision of all grounds such as exist in law and equity. So sophistication seems, according to footnote one, to live under Section 2, not as a matter of the federal clear and unmistakable. I mean in that case, they weren't – I don't think in Rent-A-Center they were talking specifically about sophistication at all. The argument that they were – I'm not sure that helps you. Well, I think that what the court was – I mean is there any other world in our 1L contract law outlines where sophistication would live other than as an unconscionability defense to formation? Sure. I believe that Judge Breyer cited the fact that there are several in one of his footnotes, cited that there are several other circumstances in which the sophistication of the party matters, fraud being a different one. So there are several different doctrines of law where that does come into play. But I think that Your Honor could simply say that this is a case where there was not a clear and unmistakable delegation looking at the expectations of the parties. Would the parties look to a daisy chain of boilerplate in order to – is that something that they would – we could say is clear and unmistakable? Well, I guess – I'm not sure that we can get around this because Brennan tells us that incorporation is sufficient for delegability. That is clear and unmistakable. Right. Well, certainly for a sophisticated party, and again, that sort of gets back to whether or not – I mean Brennan did leave it open and Patrick as recently as 2024 said that the question was open in this circuit. What evidence is there of – Patrick pointed to that there is no evidence there. As I take it, the only evidence here in the declaration is that he's not a lawyer and did not take classes – a business owner, but not a lawyer who did not take law classes, and that's – That's correct, Your Honor. I believe at the time that he executed the declaration, he was going to open a small sandwich shop, had gone to college, had no legal training. So if that's sufficient, if an independent business owner, it's sufficient to show lack of sophistication to defeat clear and unmistakable, that would apply to everyone who hasn't gone to law school? Well, I think it would apply to certain types of people. I mean it would be a fact – a very fact-intensive analysis. In the other case, you would compare it with someone like Brennan, and yes, that person happened to be a lawyer, but there are other people who are non-lawyers who have familiarity with contracts and contract reading, and I think it would be like many instances in the law. It would be a case where declarations are submitted and we take a look at whether or not, you know, on these facts, this person should be understood to know that, again, this sort of daisy chain or boilerplate and ultimately finding a rule deep within the AAA's rules that allows but doesn't demand that it be solely within the arbitrator's discretion, that that is a clear and unmistakable delegation of arbitrability. All right. Thank you, counsel. We're taking over your time. We'll hear from Bottle now. Thank you, Your Honor. I want to start with ER 342, but before I do, maybe let me clear one piece of underbrush here, which is the discrepancy between the two checkout pages. We submitted a checkout page from somebody at the company who said this is the version that existed on the day they purchased the software. Their lawyer pulled a different page and had the plaintiff say, yeah, this looks like what I saw. And so the district court relied on ours because it was actually the page that the individual saw. But turning to the terms of service in ER 342, which you asked about, Judge Johnstone, as counsel conceded, there's no dispute that one of the two plaintiffs in this case agreed to the terms of service. He admits that. So the question is whether the other plaintiff, Bobca, agreed to the terms of service at ER 342. And counsel's argument today was that he didn't because it said please submit your number, and by submitting your number, you agree to the terms. And the button said next. And counsel's argument is a reasonable consumer wouldn't understand that by submitting a number and clicking next, they were actually submitting a number. I don't think that's fair. It's not at all like the Chabala case where it was a sign-up process and it said by signing up, you will agree. And then it had a series of different pages and it said continue. I think the understanding was a reasonable consumer, certainly I would think, OK, there's going to be a time to sign up, but this isn't it. I'm just continuing in this process of – What happens if one is in and one is out? If one is in and one is out, then of the terms of service? Well, let's assume here that neither for the terms of service and one, what's conceded with respect to the monitoring contract. Then if the court agrees with us that scope goes to the arbitrator, then Schluter-Beckner would have to go to arbitration. But in terms of the litigation, there would still be – There would. The difference would be all of his claims would go to arbitration, not – you wouldn't split up the claims in the way the district court did. I know I've gotten some questions about the checkout page, and so maybe at my own peril, I just want to end there. But I do want to make one point because I think it's important because I heard my friend say a number of times that this was a transaction for hardware and there was nothing in terms of monitoring. That is just simply inconsistent with their evidence and our evidence. The evidence was undisputed that these two individuals enrolled in monitoring, security monitoring, when they purchased the equipment. And the reason that matters is they were inviting SimpliSafe into their homes for 30 days to look at their cameras, watch their alarms, and help them in calling the police if something happened. That is precisely the kind of relationship where a consumer would expect and I think probably want terms to govern the relationship. If a company is – a security company is coming into your home to keep you safe. So, counsel, I just want to clarify on this. So this means in your mind there was a continuous relationship with the parties. Did the hardware function without the alarm monitoring service? It functioned without the alarm monitoring service if you didn't elect monitoring. It doesn't function without software updates. Just like an iPhone or a PS5, they are continually sending software updates to that base station which everybody needs to buy. So it's not a one and done deal like a pair of socks. You're still getting – So even if you didn't sign up for the monitoring, at some point you need to update and so you'll get an update either via text, email? How does that work? It comes over the – it comes over your internet. So they will connect the device to their internet or even over sort of cellular service. But I – yeah, my point is even if they didn't choose monitoring, I think the nature of the device means they should have expected a continuous relationship. But they indisputably did enroll in monitoring at this checkout page. All right. Thank you, counsel. The case just argued will be submitted and the court will stand in recess for five minutes.
judges: COLLINS, JOHNSTONE, ALBA